Case number 23-7146, et al. Trustees of the IAM National Pension Fund v. M & K Employee Solutions, LLC, Appellants. Mr. Vogel for the appellants. Mr. Woodmill for the appellants. Good morning. May it please the court. As you guessed correctly, my name is Don Vogel, and I represent the appellants in this matter. In these consolidated appeals, there are a number of issues to be addressed today, all arising out of what should happen when a withdrawing employer does not honor ERISA's pay-now dispute requirement. While M & K did, in fact, honor the second part of that, and it disputed the withdrawal liability, it did not immediately pay the amounts claimed owed by the pension fund, prompting the fund to file this lawsuit. Appellants dispute the amount of the judgment entered by the district court, particularly because it applied the wrong interest rate on the delinquent amounts owed and improperly allowed the pension fund to apply the payments that were made to interest rather than principal, thereby necessarily increasing the amount of interest that it would collect. Additionally, the district court incorrectly applied one facility's union contract to another to require additional contributions to be paid, and it also wrongly determined that a number of the other appellants were jointly and responsible for the withdrawal amounts. I first want to turn my attention to the interest amount that was charged by the pension fund. The M & K was bound to the collective bargaining agreement, and through that collective bargaining agreement, it was bound to the pension fund's trust agreement. Effective on December 31, 2018, M & K canceled both agreements. The fund acknowledges that. At the time of that cancellation, the fund had a delinquent collection policy, and in it, it stated that the interest rate to be collected on delinquent withdrawal liability would be the IRS default rate. Two and a half years later, the fund decided to increase that interest rate to 18 percent and apply it back retroactively to the withdrawal liability owed by M & K. We find this to be MPPAA. Is withdrawal liability, you know, the withdrawal liability is set as of December 31 of the preceding plan year after withdrawal. Correct. Correct. Right. And is part of that withdrawal liability generally considered, the interest rate is part of the withdrawal liability? It is, and we were before you last year on this issue, and there's two interest rates that we and that determines the calculation to arrive at the withdrawal liability. Right. The interest rate we're talking about here is the interest that's owed on the money you haven't paid yet. Right. No, I understand that, but I'm saying is there some concept that that interest rate is in part part of the withdrawal liability? Like the liability is whatever amount you owe, and then, you know, obviously if you fail to pay in a timely fashion, the interest rate on that is also set at the time. The withdrawal liability is set. It's set by whatever the contract that exists as of that date. Had M & K not canceled the contract, let's say they bargained out for some reason and just said they weren't going to contribute anymore like we had in the prior case, and it ended their obligation to contribute, but still were bound to the trust agreement for some other reason, then maybe there could be additional amendments to the trust agreement that would apply to them. But that's not the case here, because at the time of the withdrawal, the contracts that applied to them and to this situation had been terminated. Everybody agrees with that. And so what the Supreme Court teaches us in the Tackett case, in the Reese case, is we look at these contracts just like ordinary principles, looking at general contractual principles. And once a contract is terminated, generally it ends the party's right to modify or change that contract unless they reserve the right to do so. With our position, they did not reserve the right to increase that interest rate and apply it retroactively. So your position is if you had remained a party to that trust agreement or bound by the trust agreement, they could have retroactively changed the interest rate, so the interest rate in that situation wouldn't be set. If in fact we had agreed to be bound going forward for some reason, yes, we're still under contract with them. And if the contract provided them with the right to make changes to it, that being one of them, we would be bound by it. But the contract was terminated. And as these other cases teach us, when a contract is terminated, courts are not supposed to interpret that contract to make lifetime promises. And that's really what the fund is looking for, is a lifetime promise to keep amending the trust agreement to impact things that happened in the past when they were some contractual obligations. Because those obligations ended, they should not have the right to continue to amend to impact a contractual right they no longer hold. And I'm asking you about some of these aspects of the case for attributing the acts of one entity to another. So I guess let's just start on the delinquent contribution point. And I refer to that as count three, that was the count three claim. Count three, in which the question is, can the acts of ES, let's see if I get this right, ES Northern Illinois be attributed to the acts of ES Summit, correct? Under a single employer theory. Correct. But you, you argue, you assume in this case that that question is assessed under this very pro-veil-piercing standard developed by the NLRA, by the NLRB, sort of multi-factor, is there functional integration? Does this look like one entity? That's a tough test for you to win on, but I wonder if it's the right one. I mean, the general background rule is we respect corporate separateness. And why would we apply this labor law test, which has as an element an appropriate bargaining unit determination, which is something the NLRB has to do. They're not, they're not party here. And I agree with your honor. It is a more stringent test and one that has not been fully adopted in, by the district courts. So shouldn't we be applying something closer to the eighth circuit Kansas City trust standard, right? You need, you need common control and you need using the entity to facilitate some sort of fraud or injustice. I, well, I do like that test, except for the common control part of it. There is a specific part of the ERISA statute that deals with common control and that's common ownership. If you look at it. Yeah. I mean, I'm going to, I'm going to ask you separately about joint and several liability where there is a statutory test, but here we're talking about the scope of the substantive obligation to make contributions. And I understand. And so the statute doesn't address that. So like, I would think you default to basic common law principles, not some quirky thing that the NLRB applies in NLRA cases. I would prefer not to default to that statute, as you say. It seems that the cases that have developed, and when they're looking at the single employer aspect, as it relates to delinquent contributions relies on this four-part test. The case that we cite that follows out of the DC circuit is this Hunter versus ARC restaurants. And it follows through that analysis really closely to this case. Why did you brief this as a four-factor NLRB test? Well, because we thought that was the, we think that's the test that applies. They're, they're curious. They're, they're, I think that doesn't, I do think that doesn't apply. Common law, veil piercing test. Well, I, I, I think in the ERISA context, as much as I like where you're going, I don't think that's the right test. I think it's on a common veil piercing. If this was a veil piercing, which we would kind of get into a little bit in, in counts four and six, but on a veil piercing of this, they would lose on a veil piercing. Are you affirmatively waiving that common law? Boy, does a lawyer ever firmly do something like, I would hate to do that. I mean, you didn't break, you clearly forfeited it. I, we, we didn't brief it because we focused on the test that's in the Hunter versus ARC restaurants, which is the four-part test, which seems to be the test that controls single employer. And I think using that test, we check the boxes and we win. I think that if you look at that test, look at all the different editions of control, and we're talking about separate facilities that are completely separate, managed separately on the day-to-day operations, and that is the test. Who is controlling that location on a day-to-day? Okay. And it's different. Let me ask you about veil piercing. Yes, sir. One threshold question, which entity made the $13 million payment to satisfy the judgment? I don't know that that's in the record. Can you tell me? I mean, this bears on mootness, which is a jurisdictional obligation we have to address. So I really need your help on this. Well, Twisted Arm, the entity that did it was the dealership. It was the dealerships that are named in counts four and six. Operating the sales entities, not the ES entities. That is correct. Okay. And they did it because they had the financial wherewithal to do it. The other entities did not. And there is an arrangement between those entities, depending on the outcome of the appeals. If that's true, doesn't that moot out the questions about whether the successor entities and the bouchers were appropriately brought in? I don't know whether they were appropriately brought in. Well, they were brought in before the payment was made, certainly. But as weather moves those issues here. What's the live controversy involving the bouchers? Because based upon what has happened in the underlying case, there is another lawsuit going on trying to use that finding from a collateral stop-loss standpoint. For contribution? Yes, and dealing with a different pension fund and a different lawsuit. And it's important to them because the bouchers, as noted, were not, in our view, a trader business. In their view, they were not a trader business. In most views, they would not be a trader business. So they should not be personally liable. And as it relates to who paid the money, it doesn't moot it because depending on how you hold on the interest portion, depending on how you hold with regard to the U.S. rule and the fund's improper application of our payment, we see money coming back. And it's going to be between the parties on our side of the V who will determine who gets what of that money returned. So it does not moot it because there's otherwise... But the fund doesn't really care about any of that. They certainly care about the interest. They certainly care about... But they don't care about how the M&K entities broadly defined, you know, everyone on your side of the V. Certainly now that they've been paid, I do not think they care. But it does matter to us because it impacts not only this lawsuit, but other lawsuits. The case of controversy for appellate standing has to involve that. Has to involve someone on each side. But it does still involve it because if in fact the dealerships made that payment and it is determined that Judge Lamberth had it wrong in counts four and six, and the dealerships should not have been found to be a joint employer or pierce the corporate veil or through whatever test, then the monies they paid would be subject to something. And I think what it is, it's a collection matter between the dealerships and the other entities on that side of the V. The fund is not going to return that money. Okay. And then just on the merits of the joint and several question for veil piercing as between the sales entities and the ES entities. I would have thought the most likely tests were either the statutory one under MEPA for joint and several or a common law one like I was asking you about earlier, Kansas City Trust. And the district court applied these other open-ended, multi-factor NLRB-based tests. One has four factors, one has six factors. And you've argued under those standards. Are you happy with that? Should we decide, assuming no mootness, should we decide the case under those standards rather than the statutory one or the common? The statutory one, we win because the dealerships and the underlying entities are not in the same control group. They do not have common ownership. Okay. I mean, that's what's so odd about this. There is a statutory standard. If the veil piercing and you all are arguing these four-factor, six-factor labor tests. I understand, Your Honor, because we certainly win on the control group. I don't think that the other side will dispute that at all.  And what they have done is raised this. What do you mean by that? I don't think the... Please don't get the shorthand. I don't think the pension fund disputes that the dealership entities at that level were in the same control group as the leasing employee entity. They were different ownership. There's no dispute about that. In my mind, if you were trying to get control group liability only, that would end the inquiry. Because they know they lose that argument, that's where they have gone to this veil piercing four-part, six-part test to try to grab them through a single employer theory. You are not pressing an argument that the statutory standard for veil piercing is an exclusive one. We have not. We have not. Or statutory standard plus common law, like use the entity to perpetuate a fraud kind of test. We did not advance that theory, right? Mr. Bollos, I have a question. If the United States rule doesn't apply, then what happens to the capitalization of interest? So part of the US rule is that there's no interest on interest. And so if we were to find that the United States rule doesn't apply, what would happen? Would interest be capitalized? It would not. I think the interest would be calculated on the amounts that were outstanding. The principal amounts that were outstanding at that period of time. My recollection from the statute is that it compounds every year. But there would still be, I mean, there would still be interest. But part of what the United States rule does is prevent capitalized interest. So if we weren't applying the United States rule, would then the interest be capitalized? Because that could be potentially, I mean, you know, that might end up being much worse for your clients. I don't think it would be. I understand. I think the way the ERISA statute calculates the interest, we would not have that problem. We would not have that problem. We would not have that problem. Because I think what would happen is you are only calculating the interest on the amount of the principal of the withdrawal liability that is outstanding for whatever period of time it's outstanding past the demand. And I think they are able on a yearly basis to capitalize on it, to compound it. I'm not sure I follow that. If the deposit is only the interest outstanding, then the interest continues on the principal. But if the deposit pays the principal, there's still an outstanding balance on the interest. Does that accumulate interest? I guess it would depend on the particular contract that you're talking about, a depositor and perhaps a bank. And banks have specific rules, and it's what the contract provides. But the contract here, as it would apply to an assessment of withdrawal liability, I don't think it compounds it in that manner that you're thinking on a normal bank depository. It still would generate interest if it's not paid. It would only on, I believe, a yearly basis. We didn't address that in the briefs, but my understanding is it gets calculated on a yearly basis. Thank you. We'll give you rebuttal. Thank you. Good morning, your honors. May it please the court. My name is Myron Rommel from the firm Proscow Rose, and I represent the trustees of the IAM National Pension Fund. This appeal arises from the M&K defendants admitted breach of their obligations as contributing employers to the fund. Chief among them was the obligation to make withdrawal liability payments when appellants collected bargaining agreements with the IAM expired. Pursuant to ERISA's pay now, dispute later rules, appellants were required to pay the full amount of the withdrawal liability assessed against them immediately while reserving the right to recover the amounts paid if they subsequently should prevail in challenging the assessment and arbitration. But defendants instead elected to do the opposite. They disputed now and paid later, notwithstanding the issuance of a series of preliminary injunction orders directing them to make immediate payment of the withdrawal liability assessed against them. They refused to make any payments until after the original assessment of $6 million was reduced to approximately $1.7 million. That arbitrator's ruling was eventually overturned, as your honor knows, and the initial assessment of $6 million was reinstated. In the interim, defendants seized on the arbitrator's ruling by making a payment of $1.7 million while ignoring the millions of dollars of interest and liquidated damages that had accumulated in the two-year period during which they completely refused to comply with the pay now, dispute later rule. Even though their payment satisfied only a small fraction of their debt, appellants contended that the payment eliminated any going forward accrual of interest and liquidated damages. Now, just let me pause and try and answer the questions that were posed at the end of my adversary's argument. Under the current version of the trust document, there is no interest on interest. So if that version applies, that 2021 trust document, then it would be the case that appellants could effectively game the system if your honors were to rule that the $1.7 million payment applied to principle. They would owe no interest on the millions of dollars of additional debt that they owed at that time. Under the prior version of the trust document, the 2019 one, there was a provision for interest on interest. So what really happened was when the 2019 trust document was amended, there was a little bit of a trade-off. The interest rate was raised and the interest on interest provision was eliminated. Your honors may appreciate that as a practical matter, when you come to court and you have floating interest rates and interest on interest, the mere calculation of the debt becomes very, very complicated and just slows down the court proceedings. So there was an effort in 2021 to just simplify that by making interest on the principle at a higher rate. But under the US rule, if the debt is bigger, the payment should apply to the interest first, which means the principle remains outstanding, which is what the district court ruled here. Let me turn to the issue about the amount of the interest rate, unless there are further questions about the US rule. Appellants argue that any interest they owe should have accumulated at the IRS rate, which is the default rate that was in place before the trust document was amended in 2021 when we inserted the 1.5% per month rate. In their view, once the MNK-ES entities withdrew from the fund in 2018, their contractual obligation to comply with the trust agreement's provision on the interest rate ceased entirely, and thus they were not contractually bound when the trust agreement was amended in 2021. And that has to be wrong. I mean... It's wrong. Obligations to pay withdrawal liability continue, of course. Correct. It's wrong for two reasons. First of all, Your Honor, it's the statute that controls the issue. The statute says point blank, it's the interest rate in the trust document. And the statute doesn't say anything about the timing of when the interest rate is put in the trust document. It doesn't speak to the extent to which the trustees can make a change effective retroactively and or after an employer has withdrawn. That's right. It contains no limitations. And I think it's helpful to keep... It doesn't speak to the question. Well, it certainly doesn't restrict the time period in which the trust document provision applies. And given ERISA's remedial objectives and the fact that we're talking about an interest rate that comes into being unlike the other one, only when the employer breaches his obligations first to pay immediately. Otherwise, we wouldn't be having this discussion about interest rate at all. Why isn't the controlling principle that obligations under the collective bargaining agreement and the incorporated trust presumptively expire at the end of the term of the agreement? Well, because... And there's an exception for withdrawal liability because the whole point of that is about consequences post-withdrawal. Correct. I see. But that's... Get the numbers right. I mean, that just means that Article 7, 7 or 8, 7 of the trust agreement continues to bind the employer after they withdraw. It's a separate question from whether Article 11 on retroactive amendments continues to bind an employer post-withdrawal. And you can give perfectly good effect to Article 11 saying, sure, retroactive amendments are fine for employers that are still in the agreement. Once they're out, they're out. I'm not sure they're mutually exclusive, Your Honor. I do agree with you. The Supreme Court case in Lytton specifically says that obligations already fixed under the contract but as yet unsatisfied survive the expiration of the agreement. And certainly, withdrawal liability would be a very good example of that because you don't even incur the withdrawal liability until afterwards. And in response to my adversary's comment, if the obligation in the trust document as it relates to withdrawal liability terminated with the termination of the agreement, then whatever interest rate was in the trust document would never apply because it would be in there and then the employer would withdraw and then his obligation would cease. So that can't be right. It must be that the provisions in the trust document survive. Isn't your view that you could retroactively change the withdrawal liability? I mean, because the withdrawal liability is fixed by statute. Why wouldn't the interest rate that applies to that also be fixed as of the same time? Because the statute says that the interest rate is whatever the trust document says the interest rate is and it doesn't limit it as to time. But in this case, even if we want to take a contractual approach, there is the provision that says that the employer agrees to adhere to the trust document and any amendments thereto and the trust document specifically reserves the right to make retroactive amendments. So I don't believe, Judge Katz, is that those two provisions are mutually exclusive. I think that provision still applies here. I agree with you. I mean, the law has two strong presumptions, which are different. One is a presumption against retroactivity. And you overcome that in Article 11, no question. But there's a different one, which is that obligations under a collective bargaining agreement expire when they expire. And you don't lightly create ongoing post-expiration obligations. I'm not sure you overcome that. I wouldn't characterize Article 11 as a retroactivity issue. I would describe it as an obligation that survives. The district court sure did. There's two and a half years of retroactivity in the mid-2021 amendment, retroactive back to January 2019. Let me just, I understand that. My point is that the obligation to pay withdrawal liability that's embodied, I think it's in Article 11, if I remember, is... I think it's 7, but... Okay, that's an obligation that continues past the expiration of the agreement. So that's why I could argue that that's sort of a prospective obligation. But I'm just, like, in my mind, conceptually, the obligation to pay withdrawal liability and interest under the rules that are fixed at the moment of withdrawal just seems different from the question whether this retroactive amendment power continues post-withdrawal. Right. But the retroactive amendment power is a general statement in the trust document that is not limited to any particular rules. And I would think that with respect to a rule, to an obligation, that post-states it. That cuts against you. If it were more tightly linked to the withdrawal liability, you could just say it's part and parcel of... I agree with that. But I think that to the extent that the withdrawal liability clearly extends beyond the period of the collective bargaining agreement, a separate general provision that says that the fund can make retroactive amendments as it applies to that rule would extend. But again, I do want to reiterate that the out-of-circuit decisions that were discussed in the briefing that got very hung up on an employer's obligation to whether he signs on to the trust document are really extending a condition that's not in the statute. The statute just says whatever interest rate is set by the trust document. And just to be clear, it's not something that continues forever, but we're dealing with an employer who hasn't paid his debts. And at the time this amendment was made, he still hadn't paid his debts. And to suggest, I know that there's a natural tendency to think that there's something unfair about applying a provision retroactively. But the whole purpose of the pay now, dispute later rule is to prevent the employer from making these types of strategic calculations about when he wants to pay and why. This is a penalty because he's breaching his obligations. And I would suggest in these circumstances, the court should not be that concerned about the retroactive nature of the provision. What was the IRS rate during that period? So I don't remember exactly. It's definitely a lot lower. Something like 6% maybe. And it depends on the time period. It floats with the period of time. I guess you have to, if the employer is correct, then for each period, each yearly period, I guess it is, you may well have a different interest rate. You have to go back and calculate that. Yes, Your Honor. And it's one of the reasons why a lot of plans have put in provisions to have a specific interest rate so as to avoid those complicated issues, because sometimes the recovery of withdrawal liability gets slowed down by those problems. If I could have just a minute longer, I just wanted to say one or two things about Your Honor's questions about bail piercing, because I think just... So let's start. They're all on my list. Okay. So let's start with mootness on joint and separate liability. Do you have any thoughts? Well, I... It's the ES... I forget which one. Was it Summit? Or no, ASLIP. That ES-ASLIP incurs the withdrawal liability. And it's the... We just learned... Maybe I assume you knew this as well. It's the sales, the M&K sales entities that pay the judgment. Right. I can't say we're shocked to learn that, because we had been told that the ES companies, well, didn't have any money, which is why we had to engage in several years of litigation. I think it's, as Your Honor said... So there's a live issue. You agree there's at least a live issue on, I'm calling it bail piercing, but the connection between the ES entity and the associated sales entity. Correct? When you say a live issue, there's an issue that affects the amount of the judgment that pertains to ES Summit and Northern Illinois. There is then a separate section of the briefing that deals with the various efforts to rope in the dealerships, which does not affect the amount of the judgment. And I think as my adversary indicated, it may have effect sort of how they charge each other for what happened here or how they would allocate some sort of recovery. But as Your Honor suggested, it doesn't have any impact on the fund. The fund got a check for the whole amount corresponding to the judgment and the fund will make a refund of a certain amount of money if we lose on something here. The entities that paid the judgment. There was no condition, we just got a check. They can continue to pursue the appeal, right? There's a live controversy. If they win the appeal, they can seek to claw back that payment. If they win the appeal, so for example, if the interest rate is 6%, they're not 8%, there'll be a recalculation of the amount of interest. And we will write a check and the appellants can decide how that check should be allocated. Just to be clear, when we get this check, there's no conditions attached. We just got a payment for the whole amount of the judgment. It wasn't like it came from so-and-so such that if so-and-so prevails on appeal, you're gonna have to get it back. You signed the check. This was just on behalf of everybody. I think what happened is, what I'm suspecting I'm hearing is that ES also was funded the money to make the payment, since as your honor said, they're the original liable party in this case. But for years, we had been told that also had no money. So it was pretty obvious that that's what happened here. But the point is, I think that's all between the defendants. And I don't think that the court- I'm just trying to get straight in my head. Do we need to address the successor liability in the Boucher's? We believe you don't because the amount of the liability will not be affected by that. And so on our side of the V, your honor's ruling should have no consequence. And while there may be these collateral issues, including something that may be going on with another fund, which has nothing to do with us, I don't know that that confers jurisdiction on your honors to address those issues. But lastly, I do want to, if I may- On the merits, let's just stay with ES versus the sales company. Judge Lamberth applied two plaintiff-friendly texts, the four-part common employer test and a veil-piercing test. Pretty similar veil-piercing test. So it doesn't have broader abuse as an element. So with respect, I do think that the nomenclature matters. The principle was single employer and alter ego, okay? Alter ego was somewhat of an additional reason for imposing liability on some of the defendants. With respect to Summit and Northern Illinois, which is the one that still moves the meter in terms of liability, the principle was single employer, which is different than veil-piercing. And there is under, as your honor pointed out, we really didn't have an opportunity to address arguments that were made here. But I think if we had that opportunity, we would have pointed out that under ERISA, a lot of these principles are applied in a very profound way that doesn't necessarily follow the common law principles. So put aside preservation for a minute. And just tell me if you, I'm just trying to think what possible tests are out there to attribute the acts of the ES entity to the sales. I think the four-factor test is the test for single employer. Common employer test. And you would apply that to veil-piercing. And I think there's a lot of history of the DC Circuit District Courts have followed the Seventh Circuit decision on that. And I think that's commonly understood. And likewise, you endorse the fund-friendly version. I'm just going to call it that for a minute. The fund-friendly version of the alter ego test that this court applied to unincorporated entities in Woodland. Okay. And as opposed to two other possible tests, which are one, the less fund-friendly alter ego standard that the Eighth Circuit applied in Kansas City laborers, which is reserved in Flynn in that footnote. And the fourth is just the statutory MEPA test. So you have to be taking the position that the statutory test and the tougher common law alter ego test are not the only ways you can. That's correct. I'm not sure when your honor is referring to the statutory test. There's a statutory control group test.  But they're not mutually exclusive. There's a control group test that defines who's a member of the control group that has to do with common ownership. And that's what, for example, renders the Bouchers liable because of their common ownership of the entities and also makes the various ES entities liable for each other because they are commonly owned. But for purposes of establishing the trust dealerships to be liable, we haven't disputed that the common control test doesn't work. But I think it's pretty clear under lots of ERISA cases that that's not the end of the discussion. You clearly can extend liability to other entities that are not in the controlled group through some of these other principles. And yes, they are common law principles, but there is a long history of ERISA applying some of these principles differently than a state court might in a judgment execution proceeding. And that's why I say, if that issue had been raised here, there's quite a volume of case law I think we would have been citing in our brief for the proposition that things in ERISA world don't necessarily work the same way as elsewhere. I mean, I know how you're going to answer this, but I guess, right, if I'm skeptical that that's the right test, but parties are coming to us arguing under those standards, we can just assume they apply. Well, yes, that was a softball. And yes, I agree with you on it. There are no further questions. For all the reasons stated, we request that the judgment be affirmed in all respects. Thank you. I'd answer the softball question otherwise. That probably wouldn't be a surprise. These are very tough questions. I mean, we struggled trying to unpack what's the common law test, the regular common law test versus the NLRB common law test. And how does that for veil piercing relate to the four-factor single employer test? You've given us none of this. Well, and I apologize for that. We did go down this path on this four-part test. And even Judge Lambert's got it wrong because there was the fifth part of finding if you make your way through the four-part test, the fund-friendly test, there's that fifth element of, well, now is it appropriate to combine these bargaining units? And that's part of the prima facie case. Which you didn't raise. Well, we did. We did raise it below. And it was raised below. And we said, that's the next step of it. And even if it's determined that we didn't raise it, it's still an element of their case they needed to establish. And they didn't establish that element. The test, the four-factor test, when you re-judge- It's very fund-friendly. Well, it is. And then when you re-judge Lambert's opinion, what we learn is the veil-piercing standard in first or second year corporate law. Yes. And the veil-piercing, because clearly there is no record at all of an attempt to defraud anybody. And in fact, the record is clear that all of these different locations were set up separately because that's how they operated because they each have a different general manager and they're each their own profit center. And the union recognized that and the pension fund recognized that because they gave them each different employer ID numbers. And the other thing that gets missed in all of that is that Illinois has this unique statute allowing an LLC to create a series entity akin to a parent subsidiary and the statute specifically authorizes that you can have these commonalities. You can have a common- But I mean, true, but it's one thing to say that ERISA and MEPA don't abrogate settled common law principles, but I'm not sure they have to incorporate distinctive state law. They don't, but when you're going through the fund-friendly tests, there's an explanation for why some things may happen under one of those tests. The example was the interrelatedness of operations so that you have the same payroll people doing payroll for the other entities. The statute says that's okay. That shouldn't be used against the company to find that they are a single employer because we're following the state's directive of how to set things up. So in conclusion, I really beg of the court to look at the issues, the 18% interest rate that he says is also a remedial measure, but that's what liquidating damages are for, okay? That the application of the payment, and I do hope that you look at and consider the Boucher's to not be a trader business, and that Jody's hobby is not used to impute millions of dollars of withdrawal liability against her and her husband. Thank you. Thank you very much.
judges: Katsas; Rao; Randolph